The case number is 5-17-156, In Interest of S.C.C., A minor. Ready to proceed? I am ready to proceed. I guess I will start. Your Honor. Mr. Camden. May it please the Court, good afternoon. My name is Patrick Sharp. I am here on behalf of the appellant, Ms. Janet Blackhorn. We are here today regarding an order which terminated the parental rights of Ms. Blackhorn. When we review a finding of termination of parental rights, we are looking at the Juvenile Court Act and the Adoption Act, which do favor the superior rights of a natural parent. And that is partially why when we discuss the termination of parental rights, there is a strenuous burden on the State. The State is required to prove by clear and convincing evidence before there can be the removal of a fundamental right for a parent. The standard of review that we are under is the manifest weight of the evidence. When we look to the initial petition that was filed by the State, there were allegations of four grounds to support a finding of unfitness. The first, that there was a failure to protect the child from conditions within her environment that were injurious to her welfare. The second, that she failed to make reasonable efforts to correct the conditions that were the basis of the minor child's removal during any nine-month period following the adjudication of neglect. The third was that she failed to make reasonable progress toward the minor child's return during a nine-month period following the adjudication of neglect. And finally, the fourth factor alleged by the State in the initial petition for termination was an inability to discharge parental responsibilities supported by competent evidence from a medical professional. At trial, one factor was dismissed by directed verdict, that being the third factor, which dealt with reasonable progress. And the court, in its final ruling, did not find clear and convincing evidence to support the factor related to an inability to discharge parental responsibilities supported by competent evidence from a medical provider. So at this point, Your Honor, it is the position of the appellant that the trial court erred in finding that she was unfit under the remaining two provisions. Your Honor, the first provision that the trial court utilized in supporting a finding to terminate Ms. Blackhorn's parental rights was under subsection G, G, excuse me, which deals with a failure to protect the child from conditions within her environment injurious to the child's welfare. When we look to a case cited in both briefs by the name of In Re CW, which is an Illinois Supreme Court case, it states in order to take a child from their parent under this subsection G, a finding is only warranted where evidence is established that the parent failed to protect the child from conditions in the child's environment which were injurious to the child's welfare. If the court were to review the remainder of that case, there is some language as well that nothing in the statute regarding subparagraph G looks to a finding of potential future abuse. What's cited within In Re CW is that the period after taking is irrelevant. In making the court's finding at trial, the circuit court stated one basis within the order to terminate Ms. Blackhorn's parental rights, and that was a failure to protect the child from men who had not been background checked or who had been convicted of sex offenses. When we look to the record that was on appeal, the court did give some additional bases for this finding. When the court detailed that there was no acknowledgement on the part of Ms. Blackhorn as far as a risk of the convicted felon and no acknowledgement of a potential risk of having new men come into the child's life without having a background check. Additionally, there was a concern within the court's ruling regarding an allegation of a lack of proper supervision during a period of visitation for Ms. Blackhorn. For ease, Your Honor, I'll try and address each of those separately. The first issue that was detailed was the presence of men convicted of sex offenses being around a minor child. Your Honor, it would be our position that the evidence within the record does not support this finding. I thought there was some testimony or something. Was it at McDonald's or some kind of a place where she was with a person that looked like a convicted felon or had been a convicted felon? Your Honor, some of the confusion with the case is just based on the names. The initial Ms. Blackhorn had children that she had signed away her rights from from a gentleman named Mike. This was not Mike? Correct. Mike introduced her to him? This was a new Mike. This is Mike from Chicago rather than... And he had a felony record. Your Honor, I'm not 100% certain on that. I know that Ms. Blackhorn had requested a background check, but I apologize. I'm not 100% certain. Regarding the evidence that was presented at trial, it was that the child was taken from Ms. Blackhorn shortly after the child's birth, and the lone witness at trial did make mention of that. I don't believe there was any claims that the child was around a sex offender prior to the taking of the child. Your Honor, with that knowledge, really the only time that a sex offender could have been around the child would have been during the period that DCFS had custody and guardianship of the minor child. Again, if we look back to the case that I previously cited to you, the NRACW, the Illinois Supreme Court case, there is some language found within that case that apparently can't be found unfit during the time that the child is placed in foster care. If we look to some of the evidence that was presented at trial, it's uncontroverted, Your Honor, that Ms. Blackhorn did make visits to the prison to see Mr. Crosby, Mr. Crosby being the father of the minor child at issue here. There was no evidence presented at trial that the child was present for those visits. In fact, again, the lone testimony that was presented on trial on page 44 of the record specifically stated that the lone child was not present for those visits. Within the trial court's ruling, there was a citation to NRAHC, which did deal with facts that were somewhat similar to what we're under today, Your Honor. And again, what that case said was that simply visiting with someone doesn't necessarily mean that you're going to bring them around your child in the future. So it would be a two-part argument on that part, Your Honor. First, that again, by the time she was going and visiting Mr. Crosby in jail, that was after the minor child at issue had been placed with DCFS. As well, Mr. Crosby will continue to be a guest of the state for quite a while, so it's just physically impossible for her to have brought the child around him at this point. Like the court had stated, there was another gentleman who was around the minor child during a period of visitation. Again, for my purposes, I was calling him Mike from Chicago just to— He wasn't introduced by Mr. Crosby? He was not introduced by Mr. Crosby. It was the situation as reflected in the record was the Ms. Black— I thought that's how she met this person. I don't believe so, Your Honor. I believe that they had met online, but I'm not 100% certain on that fact. Your Honor, what the record does reflect is that she had requested a background check for Mike from Chicago. I know the court had asked a question. I have in my notes said that I don't believe the record reflected a background check that came back with any hits. But in saying that, I don't have full confidence. Your Honor, the argument from our side would be that this event, again, did happen after adjudication when the child was placed with DCFS. Your Honor, the second issue that was stated by the court was an alleged perception that Ms. Blackhorn was distracted during a period of visitation. Your Honor, in my practice, I am a family law attorney. One of the worst things that I can imagine happening to someone is having their children taken away. And the issue that we would have with this being utilized as a factor to take someone away is I think you could walk down the street to just about any restaurant and see a parent on their phone while they're with their child. It would just cause a very slippery slope for the court if that's what we were utilizing to terminate parental rights. In the state's brief, they very eloquently pointed to a case by the name of In Re Veronica, which I believe is a 2007 Fourth District case, which did have a discussion of In Re CW and whether or not there should be some weight taken to actions that happen after adjudication after the child has been placed in DCFS custody. Your Honor, in reviewing the facts of that case, we believe that the court would distinguish the facts. The risk of harm in the Veronica case was above and beyond what is present in this case, Your Honor. We have, in that case, I believe a mother who knowingly knew that drugs were being sold in the home. We had open bottles of alcohol that were present within the minor child's room. I believe those factors are quite a bit more serious than what we see in this case. Therefore, the opponent would respectfully ask that the court overturn the finding on fitness based on subsection G. Your Honor, the second factor that the court utilized was subsection M1, which deals with a failure by the parent to make reasonable efforts to correct the conditions that were the basis for removal of the minor child from the parent during any nine-month period following the adjudication of a neglect or abuse. Your Honor, this subsection, according to In Re CP, which was cited within Ms. Blackhorn's brief, this subsection requires the court to determine whether a parent's efforts are reasonable based on the amount of effort reasonable for a particular person. Your Honor, it's important to note, because I do believe it gets somewhat confusing when we look at these cases, that there's a difference between reasonable progress and reasonable effort. If you remember to the beginning, Your Honor, there were four allegations that the state made initially. One of those allegations was a lack of progress. The court did not find that there was clear and convincing evidence to support that finding. Instead, we have a finding that reasonable effort wasn't put forward. And, Your Honor, again, it's an important designation because, at least in my review of the case, it is very easy to confuse those two ideas. Your Honor, I believe an issue was illustrated both in the brief from Ms. Blackhorn and the brief that was presented by the state, in that we do have a question of what nine-month period was utilized here. We have permanency reports from 2014, 2015, again, which show progress but no complaint about effort. Your Honor, we have testimony from the lone witness in this case, again, on page 11 of the record, who did state that there was progress that was made in 2015, there was progress that was made in 2016. On page 24 of the record, we see 2015. She's doing all of her services. Your Honor, again, as I stated, we're not looking at progress here. We are looking at effort. But I do believe there is some question there is whether or not we can have progress without effort. As the lone witness at trial testified, there were no uncompleted services at the time that the termination hearing was held. Additionally, within the state's brief, I believe on page 18, there is a statement made that there was minimal participation in therapy. It would be our position that when we have participation, we do have effort put forth on the part of Ms. Blackhorn. Your Honor, and excuse me, I keep saying Your Honors. Well, we're not here. Since the investigation period is important, it would be important to see, first, what investigation was there for reasonable effort that would reflect those initial conditions that were the basis for removal. As cited within the brief from Ms. Blackhorn, there was a first, or there was an original service plan which stated that Ms. Blackhorn did need to gain insight into previous child maltreatment and improving her parenting skills. This was reflected somewhat in the testimony at trial where we see the DCFS caseworker testify that he believed there were three initial conditions that led to the removal of the minor child. Mr. Tomas testified that the conditions that led to the removal was partially that Mr. Crosby was living with Ms. Blackhorn, the second condition that there was a risk of harm, and then the third condition was the previous taking of her other children. Your Honor, as well, there is a mention somewhat of a failure to complete services was mentioned by the trial court in its ruling as well as a alleged failure on the part of Ms. Blackhorn to acknowledge harm in the case at hand. Your Honor, I believe we can very quickly go through a couple of those. One, Ms. Blackhorn was not living with Mr. Crosby almost immediately. Again, Mr. Crosby was found guilty of the charges against him and is placed with the state at this point. And with the third issue, Your Honor, as far as her children being taken, children weren't taken from her. She did sign a termination of her rights on that. Your Honor, as far as effort goes, we see a request placed upon Ms. Blackhorn and a completion of the request. We have counseling with Community Connections for non-defending parents, which she completed. We have weekly therapy with the age group for anger management, which she completed. We have parenting skills with Project 12 Ways, which she completed. We have psychological evaluations, which did point to some need for some additional parenting classes. There wasn't an issue. She completed these provisions. There is a question about whether or not she had good faith participation, but this is on effort, Your Honor. Thank you, Your Honor. May it please the Court? Counsel? Jennifer Camden on behalf of the people. The Court's finding that the respondent failed to make reasonable efforts under Section M-1 was not against the manifest weight of the evidence. One of the conditions that caused the removal of the child was the condition of the respondent maintaining relationships with sex offenders and permitting sex offenders to have access for children and making excuses for sex offenders. Those issues were identified in her prior relationship with Michael M. and persisted with John C., the father of the child at issue here. Those issues were identified by Tomas as the reasons for the removal of the child